# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

PAULA SIMS,                  )
                              )
          Petitioner,      )
                              )
          vs.              )       CIVIL CASE NO.  97-386-MJR
                              )
LYNN CAHILL-MASHING,    )
                              )
          Respondent.     )

## REPORT AND RECOMMENDATION

**FRAZIER, Magistrate Judge:**

Before the Court is Paula Sims' Amended Petition for a § 2254 Writ of Habeas Corpus (Doc. No. 20).  Sims is challenging her convictions of first degree murder, obstruction of justice, and concealment of a homicidal death.  Following a jury trial, Sims was convicted in the Circuit Court of Madison County, Illinois, in 1990.  She is serving a life sentence and concurrent terms of imprisonment.  State court remedies have been exhausted.

Sims claims that her convictions should be set aside because she was deprived of her Sixth Amendment right to effective assistance of trial counsel.  Specifically, she claims that attorney Don Groshong failed to adequately investigate the possibility that she could assert a defense based on symptoms of postpartum depression.  She also claims that he represented conflicting interests.  Respondent argues that the state court rationally determined the facts and applied the law established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

## Background

In July, 1989, Sims was changed with various crimes relating to the murder of her infant daughter, Heather, in Madison County.  The State sought the death penalty.  Because of widespread

publicity, extensive pretrial proceedings were conducted.  Groshong filed numerous motions, including motions pertaining to confinement and bond, a motion to dismiss, a motion for a bill of particulars, discovery motions, and a motion to suppress evidence.  Following a motion to change venue, the trial was moved to Peoria County.  Groshong also filed a motion seeking appointment and payment of experts to assist the defense and motions in limine targeting evidence regarding events in Jersey County, where Sims was charged with obstructing justice and concealing the homicidal death of her other infant daughter, Loralei.  During voir dire, Groshong questioned potential jurors concerning the effects of adverse pretrial publicity.  Approximately one hundred witnesses testified, and more than fifty exhibits were introduced at a lengthy trial.

The jury heard evidence that Sims told authorities that her infant daughter Loralei was abducted in 1986.  The remains of an infant were subsequently discovered near the Sims home.  Neither the identity of the infant nor the cause, time, or place of death could be established.  The State tried to prove that Sims had a hand in Loralei's death by showing that her story about the abduction belied logic and reason.  Specifically, evidence was presented to show that efforts to recreate the abduction as Sims described it were not successful.  The State also presented evidence suggesting that Sims either did not want children or wanted a son and was displeased with her daughter.

The jury also heard that Sims told authorities that her infant daughter Heather was abducted in April, 1989.  She claimed that she was confronted by an armed, masked intruder when she was taking out trash and was ordered to return to her house.  When she complied with the intruder's instructions, she was struck in the head from behind and lost consciousness for a period of time.  After she was revived by her husband, she and her husband discovered that their daughter Heather

-2-

was missing.  According to Sims' hospital roommate, this story was similar to a story Sims related

weeks earlier about Loralei's abduction.

Heather's body was discovered in a trash barrel in Missouri a few days after Sims reported

the abduction.  A forensics expert testified that the body was in a bag that either came from a roll

of bags seized from Sims' home or the very next roll produced by the manufacturer.  A pathologist

testified that the cause of death was asphyxia -- suffocation -- and that Heather's death was a

homicide, not an accident.  The pathologist also testified that it would be medically impossible for

a person to remember receiving a blow causing a significant lapse of consciousness.

Sims testified in detail regarding events before and after Heather's abduction.  She described

an uneventful day.  She said she talked with her mother on the phone, prepared a box lunch for her

husband, and watched soap operas.  In the evening, she fed and changed her children, put her

children to bed, turned on an intercom, picked up toys, and washed dishes.  She chatted with her

husband on the phone, collected dirty diapers, and took a bag of trash outside.  When she turned to

go back inside the house, she saw a masked gunman standing near the house.  He ordered her to go

back to the house and she complied, intending to retrieve a gun from the dining room.  She felt a

blow to the back of her head.  The next thing she remembered was someone calling her name.  Her

husband, Robert, helped her up and asked about Heather.  She told him Heather was in the bassinet,

but they discovered that Heather was missing.  They checked on their son and called the police.

Sims portrayed herself as a loving, caring mother and responded to questions with

thoughtful, informed responses.  Sims' husband Robert supported her testimony.  The jury found

Sims guilty of murder, two counts of obstructing justice, and concealment of a homicidal death.

On direct appeal, the Illinois Appellate Court affirmed Sims' convictions.  Her petition for

leave to appeal to the Illinois Supreme Court was denied.

Sims initiated post-conviction proceedings.  An initial order dismissing the post-conviction

petition was reversed by the Illinois Appellate Court, and the case was remanded for further proceedings. Following remand, Sims filed an Amended Petition for Post-Conviction Relief, claiming in part that trial counsel was incompetent for failing to properly investigate a psychological defense of postpartum depression and representing herself and her husband, Robert Sims under circumstances suggesting a conflict of interest.

At the evidentiary hearing, Kathleen Hamill, an appellate defense attorney, testified that media reports of Heather's abduction caught her attention because the circumstances seemed similar to some cases she read while preparing a clemency petition. She spoke to an attorney in Groshong's office and sent him a large packet of materials pertaining to a possible defense of postpartum psychosis syndrome. Because postpartum psychosis can be detected by measuring hormone levels in the bloodstream, Hamill urged Groshong to have Sims' blood tested as soon as possible. Hamill later contacted Groshong and learned that he had received the package but had not yet reviewed the materials. After Sims was charged, Hamill sent a follow-up letter urging Groshong to test Sims' blood for abnormal hormone levels as soon as possible.

Dr. Diane Sanford, a licensed clinical psychologist with expertise in postpartum disorders, testified that the term "postpartum depression" describes a variety of mental disorders that can be experienced by women within the first year following childbirth. She explained that postpartum psychosis is a condition characterized by disordered thinking. Such a person is not in contact with reality, has a distorted perception of things in the world, and may have auditory and visual hallucinations. A person suffering from postpartum psychosis has a difficult time maintaining a clear train of thought and would be expected to have a difficult time talking to and cooperating with an attorney. She said that it is fairly common for people to deny that they have a mental illness and

that others frequently observe signs and symptoms before the mentally ill person is willing to recognize the illness.  She said that a patient experiencing disordered thinking would be unlikely to report it but might concoct a story about another person taking or harming her children.

Dr. Sanford visited Sims three or four times in 1992.  She reviewed prison mental health records and results of psychological tests that were administered for the purposes of evaluating Sims' current mental state and her mental state at the time of Heather's death.  The latter effort was attempted by instructing Sims to "recall as best she could her thoughts and feelings" following Heather's birth and as her death occurred.  Dr. Sanford did not talk to the physicians and nurses that were treating and attending Sims when she gave birth to Heather and did not examine police reports.

Dr. Sanford formed the opinion that, in 1989, Sims was experiencing extreme psychological distress, including symptoms of major depression and disordered thinking.  In particular, Sims was having strange and peculiar experiences and perceived herself as being influenced by other people who were "getting into her head."  With respect to Sim's condition in 1989, Dr. Sanford formed the opinion that Sims was suffering from postpartum depression and postpartum psychosis and was not able to recognize that she was suffering from a mental illness.  With respect to Sims' condition in 1992, Dr. Sanford formed the opinion that Sims was clinically depressed but able to look back and recognize that she had experienced mental illness in the past.  Dr. Sanford did not consider whether Sims' mental state in 1989 would have met the legal standard for an insanity defense.

Dr. Loew, a psychologist at Dwight Correctional Center, began treating Sims for severe major depression in April, 1990.  He said she was denying her mental illness at that point in time.  In 1992, when Sims began to discuss the death of her children, she indicated that she had feelings of depression when her daughter Loralei was born and to a lesser degree when her son Randall was

born.  Sims reported that when Heather was born, she felt depressed, angry, and guilty.  Dr. Loew thought Sims had suffered episodes of major depression at various times during her life, including the periods following her children's births.  He said she reported a suicide attempt before she was arrested.  He also said it would be normal for a person to experience depression after being convicted of killing her child and being sentenced to a term of natural life.

Sims testified that her father retained Groshong to represent herself and Robert, her husband. She said she was not aware that Groshong had represented Robert in an unrelated proceeding.  She said she talked with Groshong about what happened and told him what she believed to be the truth at that time - that she was not responsible for Heather's death because a masked gunman had stolen her baby.  Groshong did not discuss the possibility of her testifying against Robert, and she was not aware that the prosecution asked Groshong whether Robert would testify against her.  Sims said she had never heard of postpartum depression, was not aware that she had a mental illness, and did not discuss with Groshong the possibility of raising the insanity defense based on postpartum depression.  She admitted that she testified at her trial that she was doing well after her daughter was born and explained that she did not know about or understand her psychosis at that time.  Sims said Groshong suggested a psychiatric examination but one was not conducted.  Sims also said Groshong advised her to keep her mouth shut.  She said that Groshong told her the prosecution offered to bargain on the sentence if she implicated Robert.

After she was convicted, Sims told Groshong that she was physically responsible for the death of her daughter and made a statement in an unsuccessful effort to persuade the Assistant State's Attorney to seek a sentence other than the death penalty.  Sims admitted that she signed a written waiver of any potential conflict of interest in Groshong's dual representation.  In 1992, she decided to cooperate with Drs. Kammerer and Peterson and told them that she actually did the things

she was convicted of doing.

Eugene Peterson, a licensed clinical professional counselor, testified that he performed an initial intake interview of Sims after she was sentenced in 1990.  At that time, petitioner denied mental health problems, denied any history of mental health problems, and reported no difficulty with concentration.  Sims was oriented, responded appropriately to his questions, and seemed to understand why she was there.  Peterson observed no signs of psychosis.  He made a provisional diagnosis that Sims was suffering from an adjustment disorder with depressed mood and said it was not uncommon for some people suffering from mental illness to deny their illness.  He said another doctor interviewed Sims and diagnosed major depression.  Sims was assigned to the Mental Health Unit for treatment.

Dr. Daniel Cuneo, a clinical psychologist, reviewed Sims' medical records, prison mental health records, and transcripts of the testimony offered by Drs. Sanford and Loew.  He said it was highly unusual for a psychological test to be administered in the manner used by Dr. Sanford.  He thought the best diagnosis would have been made near the time of the crime.  He distinguished postpartum depression from the rare condition of postpartum psychosis, which he characterized as a break from reality with hallucinations, delusions, and disorientation.  He found no evidence supporting a diagnosis of postpartum depression or postpartum psychosis in Sims' case.

An Assistant State's Attorney testified that his goal was to drive a wedge between Sims and Robert in order to convince one of them to implicate the other as Heather's killer.  Groshong's dual representation hindered his efforts.

Lawrence Taliana, a court psychologist, criticized Dr. Sanford's decision to administer tests while Sims was unsupervised but admitted that her diagnosis could be accurate if test conditions

were less than ideal.

Don Groshong testified that Sims' father, Sims, and Robert paid his fee.  He received numerous unsolicited phone calls and items of mail prior to trial.  The attorneys with whom he was associated helped him prepare the defense strategy.   An associate researched the defense of postpartum depression and he considered the possibility of asserting an insanity defense and found no indication that Sims was unfit to stand trial or otherwise in need of a psychiatric evaluation.  He rejected a postpartum depression defense and declined to purchase blood tests or psychiatric examinations because funds were limited and at the time, he believed Sims' claim of innocence.

Groshong did not think duel representation created a conflict of interest because Sims and Roberts could not offer evidence against each other.  While he was aware that the prosecution was attempting to manufacture a conflict, Groshong did not seriously consider Robert as a suspect.

Attorney Christopher Hunter testified that he researched the issue of postpartum depression prior to trial and gave the results to Groshong.  He met with Sims after the trial and explained the ramifications of Groshong's dual representation.  Sims executed a written waiver of any conflict of interest.

Sims' Amended Petition for post-conviction relief was denied.  That decision was affirmed on appeal.  In resolving Sims' claims, the Illinois Appellate Court declined to use hindsight to evaluate trial counsel's performance.  The Illinois Appellate Court determined that trial counsel employed a reasonable and sound strategy when he assessed his options and decided to forego further pursuit of a mental illness defense that his client could not support.  The Illinois Appellate Court also determined that, because Sims could not implicate her husband, trial counsel did not have an actual conflict of interest.  Sims' petition for leave to appeal the state appellate court's decision

-8-

was denied.

## Standard of Review

Sims' habeas claims are governed by the provisions of the Anti-Terrorism and Effective Death Penalty Act. In order to grant habeas relief, this Court must find that the state court reached a decision that was contrary to or involved an unreasonable application of federal law, as determined by the U.S. Supreme Court, or reached a decision that was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A case that applies a rule of law that contradicts the law determined by the Supreme Court or reaches a decision differently than the Supreme Court on a set of materially indistinguishable facts is "contrary to" federal law. *Id*. at 405. A case that applies the proper law to the facts in an objectively unreasonable manner is an "unreasonable application" of federal law. *Id*. at 407.

## Ineffective Assistance of Trial Counsel

Sims claims that she was deprived of her Sixth Amendment right to effective assistance of trial counsel when Groshong (1) failed to fully investigate a possible defense based on postpartum depression and (2) represented her and Robert under circumstances presenting a conflict of interest. Respondent maintains that the state court applied the correct federal law and rationally determined that petitioner was not deprived of her right to effective assistance of trial counsel.

The Supreme Court has determined that, in order to establish a claim for ineffective assistance of counsel, there must be proof that: (1) the attorney's performance fell below an objective standard of reasonableness, and (2) the attorney's deficient performance resulted in actual prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). With respect to the "performance"

-9-

prong of the *Strickland* standard, attorneys have a professional obligation to conduct "reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id*. 466 U.S. at 691. The duty to investigate derives from counsel's basic function, which is "to make the adversarial testing process work in the particular case." *Id*. 466 U.S. at 690. With respect to the "prejudice" prong of the *Strickland* standard, there must be a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *Id*. at 694.

**I.      Trial Counsel's Investigation of a Mental Illness Defense.**

Sims claims that her attorney's performance fell below an objective standard of reasonableness. The Illinois Appellate Court evaluated trial counsel's investigation of a possible mental illness defense based on symptoms of postpartum depression or postpartum psychosis. The Court determined that counsel made a sound strategic decision not to pursue a defense that his client could not support. The Illinois Appellate Court's decision is consistent with and not "contrary to" the *Strickland* standard. Moreover, the Court applied the *Strickland* standard to the facts in an objectively reasonable manner.

The Illinois Appellate Court found that Groshong considered the viability of a mental illness defense prior to trial and rationally determined that the facts, as he knew them, did not warrant further investigation. Groshong's strategic decision to concentrate his efforts on other matters, including challenging the circumstantial evidence of Sims' criminal conduct, rather than encourage Sims to admit involvement and pursue an insanity defense does not fall short of objective professional standards. The relevant facts existing prior to trial would not lead reasonable counsel to believe that the prosecution had strong evidence that Sims caused or was accountable for Heather's death. Moreover, the available facts would not persuade a reasonably prudent attorney that Sims had a viable insanity defense. Groshong could rationally conclude that Ms. Hamill's

-10-

proposed defense theory was unsupported by existing evidence and not worth pursuit.  While the Supreme Court expects defense attorneys to take reasonable steps to locate *existing* evidence when the materiality of the evidence should be apparent, yet, no Supreme Court decision instructs defense attorneys to attempt to *create* evidence that does not otherwise exist. *See Williams v. Taylor*, 529 U.S. 420 (2000)(counsel's failure to investigate existing psychiatric report was deficient).

The Illinois Appellate Court's decision is also reasonable because Sims did not meet the second prong of the *Strickland* standard.   In post conviction proceedings, Sims presented questionable opinion evidence that she suffered symptoms of postpartum psychosis in 1989.  Sims presented no evidence that symptoms of the disease prevented her from appreciating the criminality of her conduct or conforming her conduct to the requirements of the law.  Absent evidence strongly suggesting that Groshong could have presented a viable insanity defense, there is no reasonable probability that the result of the trial would have been different.

### II.   Trial Counsel's Representation of Conflicting Interests.

Sims also argues that Groshong's duel representation of her interests and Robert's interests presented a conflict that hampered his representation.  Joint representation of conflicting interests that actually affects the adequacy of counsel's representation violates the Sixth Amendment. *Cuyler v. Sullivan*, 446 U.S. 335, 348-49 (1980).

Sims has not shown that the Illinois Appellate Court's decision is contrary to or an unreasonable application of federal law, as announced by the Supreme Court.  Robert Sims was never charged with a crime.  At trial, he supported plaintiff's testimony.  His interests did not diverge from Sims' interests simply because the prosecution employed a "divide and conquer" strategy that did not succeed.  The evidence does not show that Robert implicated Sims or that Sims could have implicated Roberts in order to obtain a benefit that was unavailable due to Groshong's

dual representation.  The Illinois Appellate Court rationally determined that Sims' trial counsel did not have an actual conflict of interest.

## Conclusion

The Illinois Appellate Court's decision is not contrary to and does not involve an unreasonable application of federal law, as determined by the U.S. Supreme Court and is not based on an unreasonable determination of the facts in light of the evidence presented.

IT IS RECOMMENDED that Paula Sim's § 2254 Amended Petition for a Writ of Habeas Corpus (Doc. No. 20) be DENIED.  This action should be dismissed with prejudice.

**SUBMITTED:   April 15, 2005   .**

*s/Philip M. Frazier*
**PHILIP M. FRAZIER**
**UNITED STATES MAGISTRATE JUDGE**